UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 16-10153-GAO

UNITED STATES OF AMERICA,

v.

SANTO GERMAN CARMONA-AYBAR,
a/k/a "Emilio Carmona,"
Defendant.

OPINION AND ORDER
September 6, 2018

O'TOOLE, D.J.

The defendant, Santo German Carmona-Aybar, also known as "Emilio Carmona" (referred to herein as "Carmona"), is charged by superseding indictment with one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(B)(vi). He has moved to suppress evidence seized during a consent search of his bedroom, on the ground that his consent was not voluntary but coerced.

The Court held an evidentiary hearing during which it received exhibits and heard testimony from Drug Enforcement Administration ("DEA") Special Agent Jeffrey Commander and DEA Task Force Officer Juan Infante.[1]

---

[1] Carmona submitted an affidavit as an exhibit to the motion to suppress, but did not testify at the evidentiary hearing and was not subjected to cross-examination about the contents of his affidavit. Accordingly, while the Court has discretion to strike the affidavit, see United States v. Baskin, 424 F.3d 1, 3 (1st Cir. 2005), I choose instead to give the affidavit little weight because its assertions were not subject to either elaboration or testing.

Most of the facts relevant to this motion are not in dispute. There is no dispute that Carmona signed a form that gave his consent to a search of his room. The dispute between the parties is whether his consent was voluntary or coerced by attendant circumstances.

On February 9, 2016, at approximately 1:35 p.m., DEA agents and members of the Methuen Police Department executed a federal search warrant at 172 Warwick Street in Methuen, Massachusetts.[2] The warrant had been issued as part of an ongoing narcotics investigation after law enforcement had made several controlled purchases of heroin and fentanyl from Luis Carvajal, who lived at the apartment. The executing officers knew that Carvajal was at the time engaged in a controlled undercover sale of drugs to other officers in New Hampshire and would not be in the apartment at the time of the search. After knocking and announcing, officers forcibly entered the apartment and conducted a protective sweep. They found Cynthia Vega, Carvajal's girlfriend, and her infant child to be the only persons inside. During the search, Carmona entered the apartment through a door from a back staircase. Surprised by his entry, officers frisked Carmona for weapons, and asked where he had come from. Realizing that Carmona spoke only Spanish and could not understand their questions, officers decided to conduct a safety sweep of the rear stairwell Carmona had apparently used to enter. Following it down to the basement, they discovered two small bedrooms. In one officers encountered an unknown male who they later determined was unrelated to their investigation. In the second bedroom, they saw a "kilogram press" and other drug paraphernalia while checking for the potential presence of other persons.

To help them communicate with Carmona, the officers called for another DEA task force officer, Juan Infante, a native Spanish-speaker, to come to the scene. Infante, who had been involved in the investigation as an undercover purchaser, arrived at the scene wearing jeans, a

---

[2] 172 Warwick is the second floor apartment of the two-family home at 170/172 Warwick Street.

ballistic vest with "DEA" and "POLICE" on it, a police badge around his neck, and a balaclava mask, which covered all of his face except for his eyes and part of his nose. Like Carmona, Infante is a native of the Dominican Republic; speaking in Spanish, he introduced himself to Carmona who was seated in the kitchen at that time. Fearing that Carvajal's girlfriend, whom Infante believed to be involved in her boyfriend's drug activity and who was nearby, might overhear any conversation with Carmona, Infante asked Carmona if he would be willing to speak in one of the apartment's rear bedrooms. Carmona agreed, and Infante, Carmona, and another officer then proceeded to into the bedroom. Carmona was not in handcuffs. None of the officers had unholstered any firearms.

After identifying himself as a DEA agent, Infante advised Carmona that he had rights, and that he did not have to say anything or answer any questions, but that honesty was the best course of action. He also stated that he could not give Carmona any legal advice. Infante then started to advise Carmona specifically of his Miranda rights, but Carmona interrupted him and began making statements concerning the location of drugs in the house. He stated, in a hushed voice, that "everything was going to be in the basement" and that "Luis's things" were downstairs, among other things. Infante told Carmona to remain quiet until he had been advised of his rights, but he continued making statements concerning the location of drugs throughout the interaction, including that he occupied the second bedroom in the basement.

Infante advised Carmona to remain silent three times, but was without success. Carmona kept interrupting. Infante then led Carmona back into the kitchen and read him a Spanish Miranda Rights waiver verbatim. After Infante confirmed that Carmona could read Spanish, Carmona was given time to read the waiver himself, after which he told Infante that he understood it, and signed

it. Carmona also verbally consented to a search of his bedroom, and read and signed a Spanish-version DEA Consent to Search form to that effect.

The ensuing search uncovered nearly 350 grams of fentanyl, approximately 5 grams of heroin, and a variety of drug processing paraphernalia, including "finger" press blocks, electric blenders/grinders, a digital scale, a box of rubber gloves, drug packaging materials, a kilogram press, and a cell phone Carmona said had been given to him by Carvajal. Carmona told officers that he knew that there were drugs in the bedroom and had seen Carvajal and others using the drug presses, but that he himself had not been involved in packaging or selling drugs.

It is undisputed that Carmona gave verbal consent to the search and signed a written consent form. Carmona argues, however, that his consent was effectively coerced by reason of Infante's intimidating appearance, particularly by the fact that he wore a facemask throughout his interaction with Carmona.

In order for consent to a search to be valid, the government must prove by a preponderance of the evidence that the consent was voluntary and uncoerced. United States v. Vazquez, 724 F.3d 15, 18 (1st Cir. 2013) (citing United States v. Vanvliet, 542 F.3d 259, 264–65 (1st Cir. 2008)). "The presence of coercion is a question of fact based on the totality of the circumstances, including 'the consenting party's knowledge of the right to refuse consent; the consenting party's possibly vulnerable subjective state; and evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place.'" Id. at 18–19 (quoting United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989)).

After consideration of all the evidence, I conclude and therefore find that Carmona's consent to the search of his bedroom was voluntary in the necessary sense, and concomitantly that it was not coerced. First, it is noteworthy that Carmona voluntarily inserted himself into the scene

of the search activity in the second floor apartment. The searching officers were entitled to assure themselves that there were not other persons in the building, including the lower floor bedrooms, who might pose a threat or similarly intrude. See United States v. Winston, 444 F.3d 115, 119–20 (1st Cir. 2006). It was during that "protective sweep" that officers first saw evidence of illegal drug activity in Carmona's room.

The simple fact that a number of armed officers were present to conduct the warranted search is not significant for the present case. See, e.g., United States v. Chaney, 647 F.3d 401, 407 (1st Cir. 2011) (noting that "neither the number of officers who entered the room (five) nor the readiness of their weapons suggests an overwhelming show of force"); United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008) (holding consent given after "some ten to fifteen government agents, guns drawn, entered [the defendant's] hotel suite without knocking, handcuffed him, placed him in a separate room, and proceeded to interrogate him" was not coerced). Carmona's argument rather is that Infante wore an intimidating mask during their interactions, and his appearance was both threatening and intimidating.

There was a legitimate reason for Infante to conceal his face during the events at 172 Warwick Street. His police work included acting as an undercover officer dealing with drug suspects, and it would have undercut, if not foreclosed, his utility in that respect if his identity and status as a law enforcement officer were to be revealed to persons, such as Vega and (for all officers knew at the time) Carmona, who were associated with the target of the drug investigation.

Apart from the fact that his face was concealed, Infante did not otherwise act toward Carmona in an intimidating way. He did not display a weapon. He spoke in a calm tone. Indeed, he tried to tell Carmona not to start making statements until he had finished advising Carmona of his Miranda rights, but Carmona kept talking anyway.

It is sometimes the case that a person presented with a police request to consent to questioning or a search will calculate that the best strategy for the long run is to appear cooperative. That appears to have been Carmona's thought here: he seems to have been anxious to "explain" what appeared on the surface to be incriminating. This apparent insistence on being heard makes clear that there was no "mere acquiescence" on Carmona's part. See United States v. Brake, 666 F.3d 800, 806 (citing United States v. Perez-Montañez, 202 F.3d 434, 438 (1st Cir. 2000)). Carmona was impatient to show and explain that he was not culpable. Whether his statements were cooperative or calculated, they were most certainly knowing and voluntary. See United States v. Mendenhall, 446 U.S. 544, 559 (1980) ("[T]he question is not whether the respondent acted in her ultimate self-interest, but whether she acted voluntarily.").

Finally, Carmona also claims that his consent was invalid because he was not told that he could withhold it. The Court of Appeals has "repeatedly held that the failure to advise a defendant of his right to refuse consent does not automatically render such consent invalid." Jones, 523 F.3d at 38 (citing Perez-Montañez, 202 F.3d at 438). Carmona understood that he did not need to speak and could have a lawyer if he wanted one. The failure to be advised of his right to withhold consent did not make the consent involuntary in these circumstances.

Accordingly, I find that the government has met its burden of establishing that Carmona understood the significance of his consent, and that it was freely given and uncoerced. The Motion to Suppress (dkt. no. 71) is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge